# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

RODRECUS SMITH,      )
                       )
        Plaintiff,      )
                       )
     v.                )     No. 3:20-cv-00791
                       )     (Crim. Case No.
UNITED STATES OF AMERICA    )     3:15-cr-00147-3)
                       )
        Defendant.    )

## <u>MEMORANDUM OPINION</u>

Three days into his trial on charges relating to a Hobbs Act robbery and the resultant murder of Mario McKnight, Rodrecus Smith pled guilty to all of the charges against him in the Third Superseding Indictment (Doc. No. 570). Contending primarily that his trial lawyers were ineffective in many ways because, among other things, they: (1) did not understand or adequately explain to him the interstate nexus requirement of Hobbs Act robbery; (2) persuaded him to plead guilty without the requisite nexus; and (3) had him admit "damning" allegations regarding his intent, Smith, through appointed counsel, filed a "Supplemental Motion to Vacate, Set Aside or Correct Sentence in accordance with 28 U.S.C. § 2255" (Doc. No. 6). That Motion and Smith's *pro se* Motion to Vacate, Set Aside or Correct Sentence (Doc. No. 1), raising claims under <u>Rehaif v. United States</u>, 139 S. Ct. 2191 (2019) and <u>United States v. Davis</u>, 139 S. Ct. 2319 (2019), have been fully briefed by the parties. (Doc. Nos. 2, 6, 16, 21). For the reasons that follow, both motions will be denied without a hearing.

# I. **Background**[1]

Initially charged with six others in a fourteen-count Superseding Indictment, Smith was charged in the Third Superseding Indictment with six counts. Specifically, he was charged with conspiracy to commit Hobbs Act robbery (Count One); Hobbs Act robbery (Count Two); using, carrying, brandishing, and discharging a firearm in a crime of violence resulting in death (Count Three); being a felon in possession of ammunition (Count Four); and two counts of intimidating a witness, or attempting to do so (Counts Five and Six). All of those charges stemmed from the robbery of a participant in an illegal dice game.

In 2013, Timothy Oglesby regularly ran high-stakes dice games outside his home on Argyle Avenue in the Edgehill area of Nashville, Tennessee. It was common knowledge in the area that drug traffickers used illegal drug proceeds to gamble in those games. Smith had previously been at some of those games. However, in mid-October, 2013, Oglesby asked Smith not to come around anymore because some of the participants were concerned about Smith's reputation as an armed robber.

On October 30, 2013, Maurice Payne participated in one of Oglesby's dice games, winning $5,000 in cash. Towards the end of the game, Smith and two friends arrived, but the friends decided to go Halloween shopping, and left the area. After the dice game broke up, Smith, armed with a large MAC or TEK style firearm,[2] robbed Payne of his winnings, which Payne had thrown on the ground in response to Smith's robbery demands. Smith also pointed the weapon at other people

---

[1] The facts are drawn from the trial testimony and the statement of facts supporting Smith's guilty pleas.

[2] The weapon had an extended magazine capable of holding approximately 30 rounds.

2

present, warning that he would shoot them if they interfered with the ongoing robbery.

As the robbery was unfolding, Martin Frierson was across the street in a commercial dry-cleaning van that he used to pick up and deliver laundry to people in the area. McKnight was there to pick-up dry cleaning from Frierson but, seeing the robbery in progress, jumped into the van and told Frierson to drive off. As the van was passing by, Smith opened fire. McKnight, who was lying on the floor of the van, was struck.

Frierson heard McKnight exclaim that he had been shot, drove a few blocks, pulled over, called 911, and attended to McKnight's wound. Despite Frierson's efforts and those of responding emergency medical personnel, McKnight died from a bullet that struck his spleen, nicked his spine, and ruptured his aorta.

Smith fled by jumping into the back seat of a Nissan Murano driven by co-defendant Martez Parham. Later that evening Parham drove Smith to a gas station in Green Hills, where he got into a vehicle occupied by several others and disappeared.

In November 2013, Smith called Oglesby several times in an effort to keep him from cooperating with the authorities. In the initial calls, Smith told Oglesby to "keep it real," which Oglesby understood to be an instruction not to provide information to law enforcement. After these calls, Smith learned Oglesby had identified him in a photo spread, and told Oglesby that he would kill Oglesby, Payne, and Frierson in order to prevent Oglesby and the others from providing information about the robbery and homicide. Later, Smith told Oglesby that he would not kill him if Oglesby would kill Frierson and Payne.

In March 2014, Smith was charged in state court with robbery and homicide. He was not apprehended until he was found by the United States Marshal's Fugitive Task Force on June 18,

3

2014, hiding in a closet in a room containing a small child. The state charges were dropped in favor of federal charges.

In July 2018, Smith was in the Robertson County Detention Facility awaiting trial on the federal charges. While there, he made multiple recorded jail calls in an effort to convince potential witnesses from testifying. Three-way calls were placed through his sister, during which Smith asked Oglesby's son, Floyd Hughes, to tell his father to "fall back" and "keep this shit real." Smith also called Marco Lewis'[3] wife and told her to tell her husband to "keep that shit real," "keep that shit loyal man," and to "keep that shit 100."

As noted at the outset, Smith pled guilty mid-trial. At the sentencing hearing on October 24, 2019, the Government sought the life sentence that the advisory Guidelines suggested for a defendant with an offense level of 43, and a criminal history category VI. Smith argued that a downward variance to sentence in the neighborhood of twenty years would be appropriate because he had no idea McKnight was in the van, and he had been subjected to physical and emotional abuse at the hands of his father while a child. Ultimately, the Court sentenced Smith to 408 months' (34 years) imprisonment, as follows: 240 months on Counts One, Two, Five and Six, to run concurrently with each other; 120 months on Count Three, to run consecutively to all other counts; and 48 months on Count Four, also to run consecutively to Counts One, Two, Five and Six.

The Government's theory at trial was that Smith committed a Hobbs Act robbery because Payne was a drug dealer who was gambling drug proceeds and would have reinvested his winnings to purchase more drugs. It is this supposedly ill-conceived theory that serve as the basis for the bulk

---

[3] Lewis was present during the robbery, knew both Smith and Parham, and would have been able to identify them.

of Smith's claims in his supplemental motion to vacate.  First, however, the Court considers the motion filed by Smith *pro se*.

## II.  <u>Initial Motion to Vacate or Correct Sentence</u>

In his *pro se* motion, Smith makes three arguments: (1) Hobbs Act robbery is not a predicate crime of violence under <u>Davis</u> for purposes of Section 924(c); (2) he lacked the requisite knowledge under <u>Rehaif</u> for purposes of his felon in possession of ammunition conviction; and (3) counsel were ineffective because they "forced" him to plead guilty.  None of these arguments have merit.

### A.  Hobbs Act Robbery Charge

The Supreme Court in <u>Davis</u> dealt with the residual clause of Section 924(c), which includes felonies "that by [their] nature, involv[e] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B). This is distinct from the elements (or use of force) clause that increases punishment for a felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  <u>Id.</u>  The Supreme Court found the residual clause of section 924(c) unconstitutional, just as it had with the residual clause defining "crime of violence" under the Immigration and Nationality Act in <u>Sessions v. Dimaya</u>, 138 S. Ct. 1204 (2018), and just as it had with the residual clause under the Armed Career Criminal Act in <u>Johnson v. United States</u>, 576 U.S. 591 (2015).  None of this helps Smith, however.

Smith was charged with, and pled guilty to, Hobbs Act robbery.  That crime "still qualifies as a crime of violence under § 924(c)(3)(A), which was unaffected by <u>Davis</u>." <u>Bright v. United States</u>, No. 20-6089, 2021 WL 1100448, at *1 (6th Cir. Feb. 4, 2021) (citing <u>United States v. Gooch</u>, 850 F.3d 285, 292 (6th Cir. 2017)).  In other words, the <u>Davis</u> "decision left § 924(c)(3)(A)'s

5

elements clause definition of 'crime of violence' intact." United States v. Holmes, 797 F. App'x 912, 918 (6th Cir. 2019); see also, Porter v. United States, 959 F.3d 800, 802 (6th Cir. 2020) ("Both history and common sense suggest that robbery with a deadly weapon involves an element of physical force," and "[p]recedent holds the same.").

## B. Felon in Possession of Ammunition Charge

In Rehaif, the Supreme Court held that "the word 'knowingly' [in Section 922(g)] applies both to the defendant's conduct and to the defendant's status" as a prohibited person. 139 S. Ct. at 2194. That is, the Government "must show that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it," id., such as being a convicted felon.

Rehaif was decided between the time that Smith pled guilty and his sentencing. However, after the Court acknowledged that decision at the sentencing hearing, the following exchanges between the Court and Smith occurred:

> THE COURT: But he still–so, Mr. Smith, I apologize. I should have done this earlier. You and your counsel have talked about the effect of a recent Supreme Court case that the government would have to prove you had knowledge of the fact you were a felon at the time you came into possession of this firearm. Correct?

> THE DEFENDANT: Yes, sir.

> THE COURT: And you have the right to require the government to go back and to file a new indictment so that element, that essential element, would be in the indictment and presented to you in that fashion. Do you want to waive that right and proceed today with sentencing as it has to do with the felon in possession of ammunition?

> (Respite.)

> MR. BRUNO [Defense Counsel]: Your Honor, you can ask Mr. Smith himself. But he is willing to waive any issue related to that. He wants to move forward with the sentencing today.

6

THE COURT: All right. Is that true, Mr. Smith?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Anything else from the government on that one point?

MR. KOSHY [AUSA]: No, sir.

THE COURT: All right. Well, I think that takes care of the defect. And again, I apologize for not bringing that forward.

(Case No. 3:15-cr-00147-3, Sentencing Transcript at 144-5).

"[W]aiver is the intentional relinquishment or abandonment of a known right," United States v. Olano, 507 U.S. 725, 733 (1993), and a defendant can waive his right to be indicted on the knowledge element of Rehaif. United States v. Franklin, 834 F. App'x 233, 234 (6th Cir. 2021). As the above excerpts show, Smith waived his right to re-indictment under Rehaif. Furthermore, a guilty plea "cures all non-jurisdictional defects," United States v. Mendez-Santana, 645 F.3d 822, 828 (6th Cir. 2011) (citation omitted), and a Rehaif error is non-jurisdictional, United States v. Hobbs, 953 F.3d 853, 857 (6th Cir. 2020).

## C. Voluntariness of Guilty Plea/Ineffective Assistance of Counsel

Smith argues that his trial counsel were ineffective because they "coerced [him] into a plea bargain," and "would not take 'no' for an answer." (Doc. No. 1-1 at 18). He further claims that he "wanted to proceed to trial," and that "had he gone to trial, his results would have been different and any reasonable fact finder would have seen that." (Id.). According to Smith, had he "been giving [sic] the opportunity to go to trial, [he] would have received more than likely a lesser sentence," but, instead, was given a "dummy deal plea bargain." Id. Leaving aside that Smith did go to trial but chose to abort the trial mid-stream, the record does not bear out his contentions.

7

"[G]uilty pleas must be entered knowingly, voluntarily, and intelligently in order to be constitutionally effective." Fitzpatrick v. Robinson, 723 F.3d 624, 639 (6th Cir. 2013) (citing Brady v. United States, 397 U.S. 742, 748 (1970)). "Such a determination is made after considering all of the relevant circumstances surrounding the plea or waiver." Id. "For a guilty plea to be valid, the defendant is required to understand the nature of the charges against him and the consequences of pleading guilty, including the possible punishments and loss of other rights." Id. Thus, "[t]he longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant," Hill v. Lockhart, 474 U.S. 52, 56 (1985) (citation omitted), and a voluntary plea occurs when it is "entered by one fully aware of the direct consequences." Brady, 397 U.S. at 748.

As evidenced by the thorough plea colloquy, Smith was fully aware of the nature of the charges, the potential punishment, and the direct consequences of his plea. He also affirmatively stated that choosing to plead guilty was of his own volition. After informing the Court that he had plenty of time to discuss his plea with counsel and that he had no complaints about their services to that point, and after the charges and potential penalties and sentencing guidelines were fully explained to him, the following exchange occurred between the Court and Smith:

> THE COURT: All right. Mr. Smith, as you know, we're actually in the middle of your trial, and you have every right to let that trial proceed to verdict. As I've told you previously, you–and as you know already, you'll be here–you'll continue to be here to see all the evidence presented by the government and through your lawyers to challenge that evidence. And you'll make the determination and tell your lawyers, after considering their opinion, whether you want to testify or not testify. If you decide not to testify, I'll tell the jury when I give them the final instructions that you have a right–and you've already heard me tell them this in the preliminary instruction–you have a right not to testify, and if you choose not to testify, they cannot hold that against you, they cannot even consider it when they go back in your deliberations because you have an absolute constitutional right not to testify, if you

8

so choose. Any questions about that?

THE DEFENDANT: No, sir.

THE COURT: Also, if you proceeded through the trial and you were not successful, Mr. Smith, you would have an absolute right to go to the Court of Appeals and challenge that decision. And you could go to the Court of Appeals through your attorney and tell the Court of Appeals, the jury got it wrong and tell them why. You could tell them the Court made error and why. You could make whatever arguments you want, all toward the goal of having the adverse jury verdict of guilt set aside. But if I accept your guilty plea here today, you will not be able to go to a Court of Appeals, or for that matter any court, and say, I'm not guilty of Count Six. Your guilty plea on Count Six will be forever. Understood?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And what that means is you can't come back later today, you can't come back tomorrow, next month, or any time and say, "Judge, I've changed my mind. I think we need to proceed with the trial. I want to see this thing through." All of the things that you're entitled to a trial will be gone, and they're going to be gone forever. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And is that what you want to do?

THE DEFENDANT: Yes, sir.

THE COURT: And you've had enough time to think about it and decide this is what is in Mr. Smith's best interest?

THE DEFENDANT: Yes, sir.

(Case 3:15-cr-00147, Doc. No. 757, Plea Hearing at 91-93). After confirming that Smith had not had any drugs or alcohol in the preceding 24 hours, and confirming that Smith was not on any prescription medications, the following exchange regarding the voluntariness of the plea occurred:

THE COURT: Has anyone pressured you, other than yourself, to enter a plea of guilty here today?

THE DEFENDANT: No, sir.

9

THE COURT: Has anyone threatened you that if you don't enter a plea something bad may happen to you, may happen to your family, may happen to your children, or may happen to anyone who's close to you?

THE DEFENDANT: No, sir.

THE COURT: And are you telling me that you and you alone made the final decision to plead guilty to these six counts?

THE DEFENDANT: Yes, sir.

THE COURT: And you did so after consulting with your lawyers and making up your own mind that this is what you wanted to do?

THE DEFENDANT: Yes, sir.

(Id. at 93-94).[4]  At the conclusion of the change of plea hearing, the Court found that there was a factual basis for the plea, that Smith waived his constitutional right to a trial, and that he pled guilty knowingly, intelligently voluntarily.  (Id.. at 114).

"Solemn declarations in open court carry a strong presumption of verity," and "the representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings."  Blackledge v. Allison, 431 U.S. 63, 74 (1977). Thus, "where the court has scrupulously followed the required procedure [under Fed. R. Crim. P. 11], the defendant is bound by his statements in response to that court's inquiry.  Ramos v. Rogers, 170 F.3d 560, 563 (6th Cir. 1999) (citation omitted).  Smith's present conclusory assertions do not come close to overcoming the presumption of verity or show that he was coerced into pleading guilty.  See Maldonado v. Campbell, No. 20-1345, 2020 WL 6194595, at *2 (6th Cir. Aug. 17, 2020) ("Maldonado's plea and

---

[4] Similarly, in a Plea Petition, signed under the pains and penalties of perjury, Smith averred that he was satisfied with counsels' representation to that point, and that he was pleading guilty "freely and voluntarily and of [his] own accord[.]" (Case No. 3:15-cr-00147, Doc. No. 610, Plea Petition at 4).

10

his express satisfaction with his counsel negates his subsequent claims that he pleaded no-contest due to his attorney's alleged promises or threats."); Curry v. United States, 39 F. App'x 993, 994 (6th Cir. 2002) ("Curry's conclusory allegations that his counsel misadvised him or pressured him to acknowledge his intent are subject to summary dismissal because they are unsupported by specifics and are wholly incredible in the face of the record.").

### III. Supplemental Motion to Vacate or Correct Sentence

The bulk of Smith's Supplemental Motion is based upon the supposed interplay between the Sixth Circuit's decision in Wang v. United States, 222 F.3d 234 (6th Cir. 2010) and the Supreme Court's decision in Taylor v. United States, 136 S. Ct. 2074 (2016). According to Smith, "Wang foreclosed the government's broad interpretation of Taylor, which is something defense counsel failed to appreciate" (Doc. No. 21 at 6), with "the gist of his argument" being the following:

> Granted, when a defendant "targets drug dealers for the purpose of stealing drugs or drug proceeds," the commerce element of the Hobbs Act is satisfied, just as it is satisfied when a defendant targets any interstate-commerce business for robbery. But Smith targeted Maurice Payne for a robbery solely because Payne had won money gambling. Smith did not know Payne, and he did not rob him "for the purpose of stealing drugs or drug proceeds." At the time of Smith's trial, Sixth Circuit precedent made it clear that when such targeting is absent—i.e., when the robber does not target drug proceeds but instead robs money that only "fortuitous[ly]" turns out to be drug proceeds—the commerce element is not satisfied. But Smith's lawyers never explained that Wang principle to him. And Smith was prosecuted under the theory that no such targeting was required, but rather that it would suffice that Smith had robbed gambling winnings from someone who happened to be a drug dealer, who happened to frequently use drug proceeds to gamble, and who happened to intend to spend two thirds of his gambling winnings on drugs for resale. But that theory was wrong under Taylor and Wang. Under a correct understanding of Taylor and Wang, Smith had a sound defense to the commerce element of the Hobbs Act charges because he did not know Payne or anything about him except that he had just won at gambling, and his lawyers gave him deficient advice by telling him to plead guilty to all counts, rather than telling him he had a sound defense. For these reasons, his conviction is invalid, his plea was not knowing and intelligent, and he was provided ineffective assistance of counsel.

11

(Id. at 1-2) (citation omitted).

In the Court's view, Smith reads Taylor too narrowly and Wang too broadly. Wang involved the robbery of an individual at her home, who also happened to be a restaurant owner. According to the evidence introduced at trial, defendant had previously worked for the Tsais, who owned the China Star Restaurant in Cookeville, Tennessee. After closing the restaurant on September 11, 1995, Mrs. Tsai drove home, taking with her $1,200 from the cash register, $900 of which she intended to deposit in the restaurant's bank account the following morning. Upon arrival, Mrs. Tsai found defendant lurking in the bedroom, who then struck, threatened, and handcuffed her. Meanwhile, Mr. Tsai, who had driven separately from the restaurant, pulled into the garage and was attacked by defendant's accomplice. The duo made off with the $1,200 Mrs. Tai was carrying, along with $3,000 she had withdrawn from her personal account and left in an envelope on the dining room table.

After a bench trial, defendant was convicted of several crimes including Hobbs Act robbery, although "the district court expressed a certain level of discomfort with its conclusion" because "there [wa]s no evidence of an effect upon interstate commerce." Wang, 222 F.3d at 237. On appeal, the Sixth Circuit began by observing that, "[h]istorically, we have erected a rather low threshold for determining whether robbery directed at a business establishment will give rise to federal criminal jurisdiction." Id. at 237. The court also pointedly observed that "[t]his is not to say that criminal acts directed at private citizens will never create jurisdiction under the Hobbs Act," but "when the Government seeks to satisfy the Act's jurisdictional nexus by showing a connection between an individual victim and a business engaged in interstate commerce, that connection must be a substantial one–not one that is fortuitous or speculative." Id. at 239-40. Such was not the case

12

where defendant "robbed private citizens in a private residence of approximately $4,200, a mere $1,200 or which belonged to a restaurant doing business in interstate commerce." Id. at 240.

Taylor involved the home invasion robbery of marijuana dealers, with the question being what the government must prove to satisfy the Hobbs Act's commerce element when a defendant commits such a robbery. The answer to this question was "straightforward and dictated by [Supreme Court] precedent":

> We held in Gonzales v. Raich, 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed. 2d 1 (2005) that the Commerce Clause gives Congress authority to regulate the national market for marijuana, including the authority to proscribe the purely intrastate production, possession, and sale of this controlled substance. Because Congress may regulate these intrastate activities based on their aggregate effect on interstate commerce, it follows that Congress may also regulate intrastate drug theft. And since the Hobbs Act criminalizes robberies and attempted robberies that affect any commerce "over which the United States has jurisdiction," § 1951(b)(3), the prosecution in a Hobbs Act robbery case satisfies the Act's commerce element if it shows that the defendant robbed or attempted to rob a drug dealer of drugs or drug proceeds. By targeting a drug dealer in this way, a robber necessarily affects or attempts to affect commerce over which the United States has jurisdiction.

Taylor, 136 S. Ct. at 2077–78.

Smith appears to take Wang's requirement that the connection between an individual victim and interstate commerce be "substantial" and not "fortuitous or speculative" and graft it onto Taylor's requirement that a drug dealer be "targeted" to arrive at the conclusion that he did not commit a Hobbs Act robbery because he did not know that Payne was a drug dealer. All he knew was that Payne had made money gambling, and he robbed him of those winnings. Merely because Payne was a drug dealer gambling drug money is simply too fortuitous in Smith's view to support federal jurisdiction. Ignoring for the moment those are not the facts that Smith agreed to in his plea agreement and before the Court, Smith tortures and conflates the holdings of both Wang and Taylor.

13

As the Sixth Circuit in Wang made clear, its singular concern was with the personal robbery of an individual who just happened to be a business owner, with the court fully "anticipate[ing] . . . that the 'overwhelming majority' of Hobbs Act cases brought before the federal courts will continue to be ones in which the victims are businesses directly engaged in interstate commerce." Wang 222 F.3d at 240. Taylor, on the other hand, was merely a logical extension of Gonzales and, hence, "where a robber attempts to steal [drugs or drug] proceeds from a [drug] dealer, proof of such an attempt in itself supports the conclusion that the robber attempted to affect interstate commerce, and the robber is therefore convictable under the Hobbs Act." United States v. Lee, 834 F.3d 145, 152 (2d Cir. 2016). In other words, Taylor "establishes that, pursuant to its power under the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or otherwise affects commerce over which Congress has jurisdiction," and this is true–in contrast to Wang– "even when the conduct itself has a 'minimal' effect on such commerce." United States v. Hill, 927 F.3d 188, 199 (4th Cir. 2019).

With this backdrop, Smith's assorted claims of ineffective assistance of counsel necessarily fail, particularly given the highly deferential standard of review set forth by Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). To establish an ineffectiveness of counsel claim, a defendant must first show that counsel's performance was deficient: "[a]n attorney's performance is deficient if it is objectively unreasonable under prevailing professional norms." Hodges v. Colson, 727 F.3d 517, 534 (6th Cir. 2013). In this regard, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. In fact, "[t]he Strickland Court held

14

that petitioner must show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" <u>Sylvester v. United States</u>, 868 F.3d 503, 510 (6th Cir. 2017) (quoting <u>Strickland</u>, 466 U.S. at 687).

Under <u>Strickland</u>, "a defendant must [also] 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Lafler v. Cooper</u>, 566 U.S. 156, 163 (2012) (quoting <u>Strickland</u>, 466 U.S. at 694)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Harrington v. Richter</u>, 562 U.S. 82, 105 (2011). "In making this showing, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Sylvester</u>, 868 F.3d at 510 (quoting <u>Strickland</u>, 466 U.S. at 693). Rather, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>

In a declaration, Smith avers that his "trial lawyers did not tell [him] about <u>Wang</u>," did not describe it to him, and claims that, if they had, he would have continued with the trial because he "had a good defense to the idea of [his] case even being a federal case[.]" (Doc. No. 29-1 at 1). This theme continues in both his supplemental memorandum and reply brief. In the former, he writes: "Just like the restaurant owner in <u>Wang</u> a drug dealer is a 'private citizen when not at work' . . . . And so just as in <u>Wang</u>, the robbery of Payne did not satisfy the commerce element to make the robbery a federal crime even assuming he regularly earned money by selling drugs." (Doc. No. 6 at 11) (internal citation to <u>Wang</u> omitted). In the latter, he again discusses <u>Wang</u>, reiterates that "'where, as here, the criminal act is directed at a private citizen, the connection to interstate commerce is much more attenuated,' and thus presents a special question." (Doc. No. 21 at 6) (quoting <u>Wang</u>, 222 F.3d at 238). He then cites as examples two out-of-circuit cases that "fall on

15

each side of the jurisdictional divide." (Id.).

Safely ensconced in the calm environment of an Ivory tower, it is easy enough for post-conviction counsel to find fault with trial counsel's tactics and advice (or non-advice), but a court's role is not to act as a "Monday morning quarterback." Fountain v. United States, 211 F.3d 429, 434 (7th Cir. 2000); Schumacher v. Hopkins, 83 F.3d 1034, 1037 (8th Cir. 1996). Strickland itself says that the review must be highly deferential, because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689. Besides, Smith cites no authority holding that counsel must discuss cases with his client that present inapposite facts in order to be effective, even though those cases could theoretical provide a defense. Worse yet, Smith does not acknowledge that his present theory had clearly been undercut by controlling authority prior to his trial.

In United States v. Vichitvongsa, 819 F.3d 260 (6th Cir. 2016), the Sixth Circuit discussed Wang and its requirements that the connection to interstate commerce not be "fortuitous or attenuated," but went on to hold:

> [W]e view private citizens engaged in drug crimes differently. "[I]llegal commerce counts as commerce for Hobbs Act purposes." More specifically, "robbing drug dealers is a proper basis for conviction under the Hobbs Act." Robbing drug dealers who can be "legitimately characterized as engaged in business". . . does not fall within Wang's "private individual exception," and thus the government need only show a de minimis connection to interstate commerce.

Id. at 271 (internal citations omitted). The court went on to discuss a number of Sixth Circuit cases that stood for the proposition that "Wang's private individual exception did not apply" when a

16

defendant targets and robs a drug dealer of his or her drug proceeds.  Id. at 271-72.

Given the case law that had developed in the area, counsel were ineffective if they failed to consider, or to discuss Wang with Smith prior to trial.[5] This resolves Smith's  claims that counsel was ineffective in (1) failing to seek a jury instruction incorporating Wang into the rule announced in Taylor; (2) advising Smith to plead guilty rather than continue with the trial due to the available defense of challenging the commerce element; and (3) failing to advise Smith to withdraw his guilty plea because of the lack of a sufficient interstate commerce connection.  It also resolves Smith's claims that appellate counsel was ineffective in  filing an Anders brief in lieu of filing a brief asserting that: (1) Smith's plea was unintelligent in light of Wang; and 2) trial counsel was ineffective in (a) not seeking a jury instruction incorporating Wang into Taylor, and (b) allowing petitioner to plead guilty.  It also precludes Smith's claims that his guilty plea was unintelligent  or violated the Due Process clause because, according to him, the "provable facts" would not satisfy the commerce clause element as required by Wang.

Smith's remaining claims fare no better.  He claims counsel was ineffective in allowing him

---

[5] In an affidavit attached to the Government's response, Paul Bruno, one of Smith's trial lawyers, indicates that he considered Wang and Taylor, but did not submit an instruction on the commerce issue prior to trial so as to not prematurely show Smith's hand to the Government.  Similarly, Larry Arnkoff, Smith's other lawyer, states in his affidavit that he and Bruno did not want to preview Smith's case to the Government. Instead, if the proof adduced at trial supported it, Bruno intended to submit a proposed instruction that stated if Payne was robbed of gambling proceeds and those moneys "had nothing to do with drugs and/or drug dealing, the government would not have proven the interstate commerce element."  Bruno also claims he discussed that strategy with Smith prior to trial.  This could be a valid defense strategy that Strickland instructs is not subject to second-guessing.  See Tackett v. Trierweiler, 956 F.3d 358, 374 (6th Cir. 2020) (citation omitted) ("A trial counsel's 'tactical decisions are particularly difficult to attack,' meaning that a defendant 'attacking his lawyer's performance must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'").  Further, because Defendant pled guilty, there is no way of knowing whether counsel  would have requested the instruction they suggest.  In any event, the proper instructions actually given to the jury would be determined by the Court, not counsel.

to admit the "damning" allegation that he intentionally shot at the van when he did not know McKnight was lying in the back. There was nothing ineffective about this. The proof was clear at trial that Smith did intentionally fire the weapon he used in the robbery, whether it was reflexive or not. This admission did not preclude counsel from seeking a departure or variance from first degree to second degree under the Sentencing Guidelines due to the alleged lack of intent or premeditation, and counsel in fact made the argument.

Similarly, Smith claims that counsel was ineffective in allowing him to admit during his guilty plea that he threatened to kill Oglesby and solicited him to commit murder because "(1) it was not necessary to admit any such facts in order to enter his guilty plea, and (2) Smith has always denied that the alleged facts were true, and he would personally deny those facts through sentencing." (Doc. No. 6 at 14-15). Smith further claims that "neither of those damning admissions would have been made, and the underlying allegations would not have been proven." (Id. at 15).

A fundamental problem with Smith's argument is that Oglesby testified at trial that Smith called him several times after the robbery/murder, telling him to "keep it in the streets," "keep it 100," and said he was "going to shoot up my house, kill me, kill Maurice Payne, and kill the laundry man [Frierson]." (Case No. 3:15-cr-00147, Doc. No. 621, Transcript at 73-4). This obviously went a long way towards establishing that Smith had threatened to kill Oglesby as alleged in Count Five. As for Count Six and the assertion that he asked Oglesby to kill on his behalf, Smith is not in a position to say that the allegations could not have been proven because the Government never had the opportunity to finish its proof.

Moreover, contrary to Smith's claims that the allegations were unnecessary, it is incumbent on the Court to have a factual basis before accepting a plea. Count Five was straightforward–it

charged that Smith intimidated and directly threatened to kill Oglesby. Count Six was more generic–it alleged that Smith committed witness tampering or attempted witness tampering by attempting to have Oglesby hinder, delay or prevent further communications to law enforcement related to the robbery/homicide. Clearly, the agreed statement submitted in support of the plea agreement was intended to supply the necessary factual basis for the Court to accept the plea.

In addition to the various reasons already discussed, Smith's voluntary plea and his agreed statement doom the vast majority of his claims. They also obviate the need for an evidentiary hearing.

The decision on whether to hold an evidentiary hearing on a Section 2255 petition is a matter of discretion. Huff v. United States, 734 F.3d 600, 607 (6th Cir. 2013). Recently, the Sixth Circuit has summarized the guideposts used for exercising that discretion:

> An evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." Campbell v. United States, 686 F.3d 353, 357 (6th Cir. 2012) (quoting Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999)); see also 28 U.S.C. § 2255(b). The burden "for establishing an entitlement to an evidentiary hearing is relatively light," and "[w]here there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." Turner v. United States, 183 F.3d 474, 477 (6th Cir. 1999). A petitioner's "mere assertion of his innocence," without more, does not entitle him to an evidentiary hearing. Valentine v. United States, 488 F.3d 325, 334 (6th Cir. 2007); see also Turner, 183 F.3d at 477. But when presented with factual allegations, "a district court may only forego a hearing where 'the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" MacLloyd v. United States, 684 Fed. Appx. 555, 559 (6th Cir. 2017) (internal quotation marks omitted) (quoting Arredondo, 178 F.3d at 782). "[W]hen a defendant presents an affidavit containing a factual narrative of the events that is neither contradicted by the record nor inherently incredible and the government offers nothing more than contrary representations to contradict it, the defendant is entitled to an evidentiary hearing." Huff, 734 F.3d at 607 (citation and internal quotation marks omitted).

Martin v. United States, 889 F.3d 827, 832 (6th Cir. 2018).

19

In his declaration, Smith begins by claiming that he was forced to plead guilty, a matter which this Court has already addressed and rejected. To this, the Court simply notes that, having sat through the first three days of trial, the Court disagrees with post-conviction counsel's suggestion that things were going well for Smith given "Oglesby's somewhat favorable testimony." (Doc. No. 6 at 7). To the contrary, the evidence against Smith was very strong and a conviction seemed all but a foregone conclusion by the time Oglesby finished testifying. This is so even considering that Oglesby provided Smith with a great argument for a lower sentence, *i.e.*, that Smith fired at the van because it was driving towards him and he was defending himself.

Next, Smith claims that he did not know Payne, did not know he was a drug dealer, and did not know he often had drug proceeds on his person. (Doc. No. 21-9, Smith Decl. ¶ 4). Smith also asserts that counsel did not tell him about Wang, and that he would not have plead guilty had he known about that case.

The Court has already discussed the implications of Wang. As for Smith's knowledge about robbing a drug dealer of drug proceeds, he agreed to, and is bound by, the following factual statement from his plea hearing:

> Smith knew and believed Maurice Payne, also known as Pill, hereafter referred to as Payne, was a drug dealer who frequently used drug proceeds to play in these dice games. Payne was then on federal supervised release after a federal drug trafficking conviction.
>
> On October 30, 2013, Payne gambled drug proceeds at the dice game, won well over $5,000 in cash, and would have re-invested a sizeable portion of those winnings into obtaining more controlled substances, particularly cocaine, for re-sale. The armed robbery described herein prevented Payne from doing so, and thereby interfered with commerce.

(Case No. 3:-cr-00147-3, Doc. No. 757, Transcript at 96). Given the solemnity of his plea, the Court

will not afford Smith an evidentiary hearing so that he can try to take back what he already said.

Finally, Smith asserts that he is "also bothered that my lawyers failed to tell me that Maurice Payne could be impeached by showing that he had changed his story over time by changing the amount of money he had and by eventually adding the claim that his gambling winnings would be spent on drugs to resell." (Doc. No. 21-9, Smith Decl. ¶ 6). He goes on to claim that "[t]hose facts about impeachment also would have led me to not plead guilty." Id. Even if this is true, Smith has not come close to showing the prejudice required by Strickland.

"[I]mpeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware')." United States v. Ruiz, 536 U.S. 622, 629 (2002) (emphasis in original). Indeed, "it is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty." Id. at 630. Further, Payne's various statements were presumably part of the discovery provided by the Government, and Smith does not claim in his declaration that his lawyers failed to share that discovery with him. Regardless, in his plea colloquy, Smith admitted he knew Payne as a drug dealer, and he also knew from the statement of agreed facts that Payne was a convicted drug felon who was participating in an illegal dice game, all of which would provide more than adequate fodder for impeachment. Davis v. Booker, 589 F.3d 302, 309 (6th Cir. 2009) "[U]ndisclosed impeachment evidence is cumulative 'when the witness has already been sufficiently impeached at trial.") (internal citation and quotation omitted). Of course, how effective counsel would have been on cross-examination will never be known because Smith voluntarily chose to plead guilty before Payne was called to testify.

# IV.  Conclusion

"The Sixth Amendment guarantees reasonable competence, not perfect litigation." United States v. Munoz, 605 F.3d 359, 381 (6th Cir. 2010).  "[I]n some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,'" but "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." Harrington v. Richter, 562 U.S. 86, 111 (2011) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).  Counsel's performance through three days of trial and the sentencing hearing was commendable, and Smith has not come close to showing any egregious and prejudicial error.  Accordingly, and for all of the reasons stated, Smith's Motion and Supplemental Motion to Vacate, Set Aside, or Correct Sentence will be denied.  Further, because a reasonable jurist would not  debate this Court's conclusions and Smith's claims are unworthy of further review, a certificate of appealability will not issue.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE